UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO VENACIO RIVERA,<br><br>    Petitioner,<br><br>v.<br><br>ROSEMARY DNHOH, Warden, Avenal State Prison,<br><br>    Respondent. | Case No.:  20cv2443-GPC(WVG)<br><br>**ORDER ADOPTING REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

   Petitioner Francisco Venacio[1] Rivera ("Petitioner"), a state prisoner proceeding with counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition") in the District Court for the Eastern District of California on November 19, 2020. (Dkt. No. 1.)  The case was transferred to this Court on December 15, 2020.  (Dkt. No. 18.)  Respondent filed an answer and notice of lodgment of state court records.  (Dkt. Nos. 24, 25.)  Petitioner filed a traverse on April 30, 2021.  (Dkt. No. 26.)  Magistrate Judge William V. Gallo filed a report and recommendation denying the petition for writ of habeas corpus.  (Dkt. No. 27.)  No objections were filed.  For the reasons discussed

---

[1] It appears that Petitioner incorrectly typed his name as Francisco Venacio Rivera in his petition. (Dkt. No. 1.)

1

below, the Court DENIES and DISMISSES the petition for writ of habeas corpus and also DENIES a certificate of appealability.

**Procedural Background**

On August 28, 2017, Petitioner was convicted by jury on two counts of oral copulation with a child age 10 or younger in violation of California Penal Code section 288.7(b) and one count of committing a lewd act on a child in violation of California Penal Code section 288.7(a). (Dkt. No. 24-1 at 105-07.[2]) On February 9, 2018, Petitioner was sentenced to 15 years to life, plus eight years. (Dkt. No. 24-2 at 152-53, 503.) On February 15, 2018, Petitioner appealed his conviction. (Dkt. No. 24-5 at 156.) On September 11, 2019, the court of appeal affirmed the judgment of conviction. (Dkt. No. 24-16.) Petitioner then filed a petition for review with the California Supreme Court which was denied on November 26, 2019. (Dkt. No. 24-17; Dkt. No. 24-18.)

On November 19, 2020, Petitioner filed the instant petition for writ of habeas corpus. (Dkt. No. 1.) He raises two claims: 1) a violation of his Fifth Amendment rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), arguing that his confession to the Escondido police department should have been suppressed; and 2) a violation of his Sixth Amendment right asserting that his trial counsel was ineffective for failing to file a suppression motion based on the *Miranda* violation. (*Id.* at 5.)

**Factual Background**

This Court gives deference to state court findings of fact and presume them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). In this case, the state appellate recounted the facts as follows:

---

[2] Page numbers are based on the CM/ECF pagination.

# FACTS

Rivera moved to California from El Salvador in 2013, when he was 17 years old. In or around April 2015, Rivera's mother (mother) walked into the family bedroom and found Rivera underneath the blanket with his seven-year-old sister, K. Mother pulled back the blankets and saw Rivera "[take] his hand out from [K.'s] underwear . . . [¶] and he had his thing out, well out." After this incident, Rivera moved out of mother's home to his (and K.'s) father's apartment.[3]

## *Initial Contact with Mother*

A report of the incident was forwarded to the County of San Diego Health and Human Services Agency, and A. Martinez, a child protective services worker, was assigned to investigate.[4] Martinez visited mother's home in June 2016. Rivera was not there. Mother spoke with Martinez (in Spanish) and described the incident. She told Martinez that she had seen K. and Rivera under the sheets in her bedroom. She immediately lifted the sheets and saw Rivera's hand underneath K.'s shorts or pants, and he had an erect penis.

After speaking with mother, Martinez questioned K., who said that Rivera had touched her " 'pico' " (which she indicated to mean vagina) and " 'pompis' " (buttocks) at her father's house and had told her not to tell anyone. K. said she had seen his " 'palo' " (the word K. used to refer to Rivera's penis) at her father's house.

Martinez also questioned Rivera's 15-year-old sister, J. (who is also K.'s sister). Martinez told J. she was asking questions of the family because there were concerns about her little sister. J. stated she was aware of the situation; she had been home "that day with [her] mom when she ran in the room." Martinez asked J. if Rivera had ever touched her, and J. said yes, it happened once, when she was 6 or 7, in El Salvador.

Martinez called the Escondido Police Department. An officer responded to the call. Martinez was still present in the home when the

---

[3] At trial, police introduced evidence that the father moved out of the family apartment and into his own apartment in November 2014, after Rivera was 18 years old. Rivera was born in June 1996.

[4] Mother did not report the incident she witnessed to police. However, it appears she later disclosed it to a family court services mediator in unrelated family court proceedings.

responding officer spoke with mother. Audio and video of their discussion were recorded on the officer's body-worn camera. Mother recounted the incident from the prior year when she found Rivera in bed with K. Mother explained she "checked" that K. was "okay" and sent Rivera to live with his father. Mother also stated that two weeks prior, K. suddenly protested visiting her father's apartment and confided that Rivera had touched her again. K. told mother that, when their father left the room to take a phone call, Rivera "put his hand in and touched her."

*Forensic Interview of K.*

In July 2016, C. Schultz conducted a forensic interview of K., who was then seven years old. Martinez and Escondido Police Department detective M. Mayfield were present for the interview. During the interview, Schultz asked K., "I want to know why you came here today[;] [¶] . . . did something happen to you?" K. responded, "[m]y brother touched me from behind and front." K. explained that "[Rivera] pulled [her] panties down" and touched her "pico" (vagina) and "pompis" (buttocks). Schultz showed K. a drawing of a female body, and K. circled the parts of her body where Rivera had touched her, identifying the vagina and buttocks.

Schultz then asked K. about the last time Rivera touched her. K. said the last time Rivera touched her was at her father's house. K. explained how Rivera pulled down her underwear and "put his part in [hers]." Schultz asked K. "[a]nd that happened the last time [you were] with [Rivera]?" K. responded, "[l]ots of times." K. said that Rivera touched her "above and below" the clothes. When Schultz asked, "was [Rivera] doing something with his other hand," K. stated that he had his iPhone and also said, "[h]e opened [his] zipper and he pushed the—that thing (unintelligible) and he put his little stick or pico that (unintelligible) and he put in—in mine butt and in the pico." When Schultz asked K., "[h]is stick?" K. explained, "[w]hat men have"; "that thing."

*Rivera's Confession*

In September 2016, Detective Mayfield (who does not speak fluent Spanish) had a Spanish-speaking investigator contact Rivera, a native Spanish speaker, to see if he would be willing to come to the police station and speak about the investigation. He agreed. At the interview, Rivera "admit[ted] [his] mistake." He explained that he had been sexually abused as a child in El Salvador and stated he "wanted to experiment how to feel . . .

4

what [his abuser] had felt with [him]." He detailed several incidents involving K. beginning when he was 17 years old, and explained that, when K. asked to play games on his phone, he asked if he could touch her or asked her to touch him. He detailed two incidents of oral copulation, both of which occurred at his father's apartment. Once, when K. asked to play with his phone, he asked her to "kiss [his] . . . penis" "like a lollipop" when they were in their father's living room; he stated she sucked on his penis three times. In a second incident, she "kissed" his penis while they stood in front of the open refrigerator at their father's home. He also admitted he attempted to "penetrate" K. "in her behind" and "in front." He stated these incidents occurred at mother's home when he was 17. The detectives arrested Rivera after he made these admissions and advised him of his Miranda rights. The detectives then asked additional questions, reviewing the details of the admitted incidents, before handcuffing Rivera and escorting him from the interview room.

An information charged Rivera with two counts of oral copulation (Pen. Code, § 288.7, subd. (b)) and one count of committing a lewd act on a child (*id.*, § 288, subd. (a)).

*Trial*

At trial, mother denied seeing Rivera and K. lying on a bed under a blanket and denied seeing Rivera touch K. in a way that he should not have. Mother stated she was aware K. told someone that her brother was doing inappropriate things to her, but she did not believe K.

K., who was nine years old when she testified, identified Rivera in the courtroom as her brother but denied he had ever touched her inappropriately. She also denied asking to look at his cell phone. She testified she did not remember the forensic interview.

J., now 16 years old, testified she grew up in El Salvador with Rivera. J. denied that Rivera had ever touched her inappropriately, denied speaking with a social worker from child protective services, and denied telling anyone that Rivera had touched her when they were living in El Salvador.

Child protective services worker Martinez testified about her initial visit to the family home and the statements mother and the children made then. Martinez explained that she asked J. if Rivera had ever touched her, and J. said yes, he touched her once on the vagina, when she was 6 or 7, in

El Salvador. Video from the officer's body-worn camera—depicting mother's prior statement to the police—was played for the jury.

Detective Mayfield testified she was present for the forensic interview of K., and a video of the forensic interview was played for the jury. The drawings on which K. circled body parts where Rivera had touched her were shown to the jury. Detective Mayfield further testified that another investigator who spoke Spanish contacted Rivera to ask if he would be willing to come in and speak with Mayfield regarding the investigation, and he agreed. A video of the interview was played for the jury.

The jury was instructed with CALCRIM No. 1128, oral copulation, which required the jury to find (among other things) that "[a]t the time of the act, the defendant was at least 18 years old." The jury was instructed with CALCRIM No. 1110, lewd act on a child, which required a finding that "[t]he defendant committed the [lewd] act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child." During closing arguments, defense counsel referred to Rivera's confession and argued there was no proof the incidents occurred when Rivera was over 18 years old, and the evidence indicated that Rivera did not commit the lewd act with the requisite sexual intent but rather "because [he] wanted to see what it was like to be in charge and [in] control."

The jury returned guilty verdicts on all three counts. Rivera appeals.

(Dkt. No. 24-16; *see also People v. Rivera*, Case No. D073555, 2019 WL 4296872 (Ct. App. 4th Dist., Div. 1 Sept. 11, 2019).

## Discussion

**A.   Standard of Review of Magistrate Judge's Report and Recommendation**

In reviewing a magistrate judge's report and recommendation, a district court "must make a de novo determination of those portions of the report . . . to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); *see also United States v. Raddatz*, 447 U.S. 667, 675 (1980).

Where a party fails to object, however, the court is not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985) ("We are therefore not persuaded that the statute positively requires some lesser review by the district court when no objections are filed."); *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) ("statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise"); *Wang v. Masaitis*, 416 F.3d 992, 1000 n. 13 (9th Cir. 2005) ("Of course, de novo review of a R & R is only required when an objection is made to the R & R") (citing *Reyna-Tapia*, 328 F.3d at 1121); *see also Schmidt v. Johnstone*, 263 F. Supp. 2d 1219, 1226 (D. Ariz. 2003) (interpreting Ninth Circuit's decision in *Reyna–Tapia* as adopting the view that district courts are not required to review "any issue that is not the subject of an objection"). Here, no objection was filed by Petitioner.

**B.     Standard of Review**

The petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court's decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly

established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. Under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be [objectively] unreasonable." *Id.* at 409, 411; *see also Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (unreasonable application must be objectively unreasonable). In other words, relief is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. 415, 427 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This is an extraordinarily deferential standard of review. *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer*, 538 U.S. at 71-72.

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. *Id.*

C.   **Fifth Amendment Right against Self-Incrimination**

Petitioner alleges a violation of his Fifth Amendment right against self-incrimination arguing that his statements to the Escondido police department should have been suppressed based on a *Miranda* violation. (Dkt. No. 1, Pet. at 5.) He maintains that his two-step interrogation process violated his Fifth Amendment rights under *Missouri v.*

*Seibert,* 542 U.S. 600 (2004) because he was in custody during the entirety of the interrogation.  (Dkt. No. 1, Pet. at 13-14.)  As such, he argues that the court of appeal unreasonably applied federal law by failing to apply the holding of *Missouri v. Seibert*, 542 U.S. 600 (2004)[5] and improperly relied on the *Beheler* admonitions under *California v. Beheler,* 463 U.S. 1121 (1983) (*per curiam*)[6].  (Dkt. No. 26 at 1, 5.)  Respondent disagrees contending that the court to appeal conducted a detailed analysis and reasonably applied controlling Supreme Court precedent.  (Dkt. No. 25-1 at 5-6.)

Because the California Supreme Court summarily denied the petition for review, the Court must "look through" to the last reasoned state court decision addressing the claims as the basis for analysis.  *See Ylst*, 501 U.S. at 805-06.  In this case, the last reasoned decision is the court of appeal's decision affirming the state court conviction.  (Dkt. No. 24-16.)

The Fifth Amendment right against self-incrimination requires the exclusion of statements, whether exculpatory or inculpatory, elicited in a custodial interrogation unless the suspect was first issued warnings.[7]  *Miranda*, 384 U.S. at 444.  Custodial interrogation is "questioning initiated by law enforcement officers after a person has been

---

[5] *Seibert* addressed a two-step interrogation strategy, "termed 'question-first,' that called for the deliberate with-holding of the *Miranda* warning until the suspect confessed, followed by a *Miranda* warning and a repetition of the confession already given." *United States v. William*, 435 F.3d 1148, 1154 (9th Cir. 2006) (citing *Seibert*, 542 U.S. at 609-11).

[6] In *Beheler*, the Supreme Court held that *Miranda* warnings are not required where a "suspect is not placed under arrest and voluntarily comes to the police station and is allowed to leave unhindered after a brief interview." *Beheler*, 4663 U.S. at 1121.

[7] The warnings include, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Miranda*, 384 U.S. at 444-45

taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also Kemp v. Ryan*, 638 F.3d 1245, 1255 (9th Cir. 2011).

"Two discrete inquiries are essential to the [in custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* (quoting *Beheler*, 463 U.S. at 1125 (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). "This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position." *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (*en banc*) (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.")). The ultimate question is whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112.

The touchstone for *Miranda* warnings is whether the suspect is in custody when interrogated. *Innis*, 446 U.S. at 300; *Mathiason*, 429 U.S. at 495. Simply being questioned at the police station or being a suspect does not require a *Miranda* warning.

*Beheler*, 463 U.S. at 1125 (citing *Mathiason*, 429 U.S. at 495); *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976) (it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning."). While "[i]t is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda", *Stansbury,* 511 U.S. at 324, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Id.* at 325. These beliefs "relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "'freedom of action.'" *Id.*

In *Yarborough*, factors that the Court found did not support a finding of being in custody were that the "police did not transport [the defendant] to the station or require him to appear at a particular time", the officers "did not threaten him or suggest he would be placed under arrest", the defendant's "parents remained in the lobby during the interview, suggesting that the interview would be brief", did not threaten the defendant "with the threat of arrest and prosecution", defendant was asked two times whether he wanted to take a break and the defendant went home after the interview. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). On the other hand, facts that supported a finding of custody were that the defendant was interviewed at the police station, the interview lasted two hours, the defendant was not informed that he was free to leave, and he was brought to the police station by his legal guardians rather than on his own volition "making the extent of his control over his presence unclear." *Id.* at 665. The Court also noted that the defendant's parents asked to be present at the interview "but were rebuffed, a fact that— if known to [the defendant]—might reasonably have led someone in [the defendant's] position to feel more restricted than otherwise." *Id.* In viewing these competing factors under the deferential standard of § 2254(a)(1), the Court held that the state court did not

11

20cv2443-GPC(WVG)

unreasonably apply the in custody standard. *Id.* at 664-65 ("Ignoring the deferential standard of § 2254(d)(1) for the moment, it can be said that fairminded jurists could disagree over whether [the defendant] was in custody.").

Petitioner argues that he was in custody at the initial interrogation because the interview took place at the request of the police, conducted at the police station in a small room behind closed doors, there were two officers in the room with Petitioner and neither one was particularly fluent in Spanish, and Petitioner was the only suspect. (Dkt. No. 1 at 13.) Further, he claims that even though he was told he was not under arrest and was free to leave, it is unclear whether he understood what that meant. (*Id.*) He also did not know why they wanted to talk to him and agreed to talk only if it would not affect his job and "was implicitly assured that it would[d] not." (*Id.*) Petitioner argues the court of appeal failed to apply the holding in *Seibert* and overly credited the *Beheler* admonition. (Dkt. No. 26 at 2.)

After considering the totality of the circumstances, the court of appeal held that Petitioner was not in custody prior to his arrest and his *Miranda* rights were not violated. (Dkt. No. 24-16 at 16.) Even though indicia of custody existed because Petitioner was questioned at the police station with two detectives, he was the only suspect and he was arrested at the end of the interview, the court of appeal explained that other factors supporting a non-custodial environment were more compelling. (*Id.* at 12.) These were that Petitioner voluntarily agreed to the interview and came to the police station; the detectives informed Petitioner he could leave at any time and he responded that he understood; when the detectives asked Petitioner whether he wanted the door open or closed, he decided to have it closed; Petitioner sat closest to the door leaving his path to exit the room unobstructed; he was not handcuffed or locked in the room; and "he never asked to leave, never attempted to leave, and never asked to speak to his mother or make a phone call to anyone else." (*Id.* at 12-14.) The court of appeal further noted that while the interview lasted 1 hour and 40 minutes, it was not unreasonably long because one of the detectives had to translate which extended the time. (*Id*. at 14.) The detectives also

asked open-ended questions, which Petitioner described as "respectful", they did not dominate or control the interrogation, did not use coercive interrogation techniques, were not confrontational or accusatory and did not "manifest a belief [Petitioner] was culpable or that they had evidence to prove it." (*Id.* at 14-15.)  In response to Petitioner's argument that it was not clear that he understood the detective's comments that he was there voluntarily and was free to leave at any time, the court of appeal commented that the video showed that Petitioner acknowledged verbally and by nodding his head that he understood.  (Dkt. No. 24-16 at 13 n. 5.)  The court of appeal commented that the video also showed the casual nature of the conversation between them and Petitioner's willingness to participate.  (*Id.*)  Finally, as to Petitioner's argument that he did not know why the detectives were talking to him and only agreed to talk if it would not affect his job suggests that the detectives used coercion, the court of appeal explained that Petitioner's argument is belied by the video of the interview.  (*Id.* at 15 n. 6.)  At the interview, the detective asked Petitioner what line of work he was in and if he was working now to which Petitioner asked whether talking with them affect his work.  (*Id.*) The detective responded that she just wanted to know what he did for a job and that she was not going to speak to his employer and it was "[n]othing like that . . . ." (*Id.*)  The court concluded that nothing in the record shows that the detectives employed coercive tactics during the exchange with his job.  (*Id.*)  After considering all these factors, the court of appeal concluded that "a reasonable person in [Petitioner's] situation would have felt free to leave, and his interview therefore was not custodial." (*Id.* at 15.)  Because Petitioner was not in custody during the initial questioning, the court of appeal held that *Seibert* was inapposite.  (*Id.* at 17.)

      The court of appeal articulated the legal standard based on California law similar to those of the Supreme Court, *see Early* 537 U.S. at 8, and provided a detailed analysis addressing each of Petitioner's arguments and supporting facts to support its conclusion that Petitioner was not in custody during the initial questioning.  (Dkt. No. 24-16 at 11-12; *see also* Dkt. No. 24-1 at 109-300.)  While there could be disagreement as to whether

Petitioner was in custody, on an extraordinarily deferential standard of review under § 2254(d), *Medina*, 386 F.3d at 877, the Court concludes that the state court's opinion was not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 103. Therefore, the Court concludes that the court of appeal did not unreasonably apply Supreme Court law. *See Stanley v. Schriro*, 598 F.3d 612, 619 (9th Cir. 2010) ("Because the state court delineated and weighed factors comparable to those the Supreme Court has considered . . . we conclude that the [state court] reasonably applied federal law in determining that [petitioner] was not in custody when he confessed."); *Dyer v. Hornbeck*, 706 F.3d 1134, 1139 (9th Cir. 2013) (despite the court's doubts about whether Petitioner was in custody during her statements to the police, AEDPA's exacting requirements require that the court conclude that the state court's decision was not an unreasonably application of Supreme Court law).

Further, because Petitioner was not in custody at the initial pre-*Miranda* questioning, his argument that *Seibert*'s holding applies is without merit. *See Seibert*, 542 U.S. at 604 (the defendant was initially arrested, interrogated, confessed, *Miranda* warnings given, and repeated the confession and "[t]he question here is the admissibility of the repeated statement"); *Jones v. Lattimore*, Case No. EDCV 08–1318–VAP (JTL), 2009 WL 10659770, at *14 (C.D. Cal. June 11, 2009) (because the initial interview was noncustodial, the Miranda advisements were not implicated and the admission of Petitioner's pre–*Miranda* statements during the first interview did not violate Petitioner's constitutional rights; moreover, the two-step interrogation process under *Seibert* . . . does not apply because, in *Seibert*, the defendant had already been arrested and was in custody at the time of her initial, pre–*Miranda* confession); *Suknaich v. Yates,* No. SA CV 07-1155-VAP (PLA), 2010 WL 1050980, at *19 (C.D. Cal. Feb. 9, 2010), *report and recommendation adopted by* 2010 WL 1050978 (Mar. 17, 2010) ("However, because petitioner was not "in custody" at the time of his interview at the . . . police station, the Court need not reach the issue of whether the officers employed a deliberate two-step

interrogation as a way to undermine the *Miranda* warnings."). Accordingly, the Court ADOPTS the report and recommendation and DENIES Petitioner's claim alleging a violation of his Fifth Amendment Right against self-incrimination.

In his traverse, Petitioner, for the first time, argues that the court of appeal, on a reasonable person standard, failed to take into account that Petitioner was a recent immigrant from Latin America, who does not speak English, was young, has an elementary-school education abroad, with no criminal history or prior interaction with the police. (Dkt. No. 26 at 3-4.) Because this argument was raised for the first time in the traverse, Respondent did not have an opportunity to address this argument.

First, arguments raised for the first time in a traverse are not proper and the court may exercise its discretion whether to consider new arguments. *See Brown v. Roe,* 279 F.3d 742, 745 (9th Cir. 2002); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("Habeas claims that are not raised before the district court in the petition are not cognizable on appeal."); *see also Lopez v. Dexter*, 375 F. App'x. 724, at *1 (9th Cir. 2010) (finding district court "appropriately rejected claim" on the ground that petitioner raised it for the first time in his traverse to the state's answer) (unpublished).

Notwithstanding the Court's discretion in considering new arguments, the Court also notes that Petitioner's new argument was not exhausted in state court. The opening appellate brief Petitioner's counsel filed on direct appeal is nearly identical to the Petition filed in this case. (*Compare* Dkt. No. 1 with Dkt. No. 24-13.) As such, this new argument raised in the traverse was not presented to the state court for review. Further, because Petitioner is represented with counsel, he is not entitled to the same liberal construction as a *pro se* prisoner. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (a document filed *pro se* is "to be liberally construed"); *Sadowski v. Grounds*, 358 F. Supp. 3d 1064, 1072 n. 7 (C.D. Cal. 2019) ("Because Petitioner is not proceeding *pro se,* his papers . . . are not entitled to a liberal construction."). Finally, Petitioner's new argument is summarily raised without relevant supporting caselaw or analysis. For these reasons,

the Court declines to exercise its discretion to consider his argument concerning the reasonable person standard raised for the first time in the traverse.

### C. Sixth Amendment Right to Counsel

In his second claim, Petitioner alleges that his Sixth Amendment right to counsel was violated because his trial counsel was ineffective for failing to move to suppress his statements to the police. (Dkt. No. 1, Pet. at 14.) Respondent maintains the state court rejected Petitioner's arguments regarding his trial counsel and the Court should deny his petition. (Dkt. No. 25 at 7-8.)

Here, the court of appeal concluded that Petitioner failed to demonstrate the counsel's failure to file a motion to suppress was deficient because defense counsel is not required to make futile motions. (Dkt. No. 24-16 at 16.) In addition, it found that Petitioner could not establish prejudice because had counsel moved to suppress the confession, it would have been denied. (*Id.*)

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. He must also show he was prejudiced by counsel's errors. *Id*. at 694. Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). Further, *Strickland* requires "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland,* 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. at 686-87. Therefore, Petitioner "must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477

U.S. 365, 384 (1986). The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Strickland*, 466 U.S. at 697.

Petitioner summarily argues that his trial counsel failed to investigate his interrogation by the police, failed to discuss it with Petitioner and there was no evidence that counsel was aware of the interview before trial and failed to file a motion to suppress or even object to its admission. (Dkt. No. 1 Pet. at 15.) As an initial matter, Petitioner fails to provide any specific details about counsel's conduct or any evidentiary support for his argument. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Next, Petitioner has not demonstrated prejudice showing that even if counsel had moved to suppress his statements, it would have been granted. Accordingly, the Court ADOPTS the report and recommendation and DENIES Petitioner's ineffective assistance of counsel claim.

**D.     Certificate of Appealability**

Under AEDPA, a state prisoner seeking to appeal a district court's denial of a habeas petition must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). The district court may issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that Petitioner has not made a substantial showing of a denial of a constitutional right. Accordingly, the Court DENIES a certificate of appealability.

/ / /

/ / /

/ / /

/ / /

**Conclusion**

Based on the reasoning above, the Court ADOPTS the report and recommendation and DENIES and DISMISSES the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 and DENIES a certificate of appealability.

IT IS SO ORDERED.

Dated: January 27, 2022

Hon. Gonzalo P. Curiel
United States District Judge